# Boylston Coal Company, Appellant, v. David T. Rautenbush and Harold J. Crowe, trading as Supreme Coal Company et al., Appellees.

## Gen. No. 29,774.

1. FRAUD AND DECEIT—*when evidence shows unfair competition by former employee of complainant.* The property rights of complainant corporation were held to have been violated where, in injunction proceedings to prevent the wrongful appropriation of confidential information from complainant, a mail order coal dealer, the evidence established in substance that complainant had expended a large amount of money and labor to obtain a list of agents for its business, the great value of which was lost when disclosed to a competitor, and that one of the defendants, through his employment as sales manager for complainant, obtained such list and used it, before he left complainant's employ, for the benefit of a competing firm of which he became a member, and that such competing firm, by reason of said defendant's use of such list, was enabled to begin business practically without expending any money or labor in creating a list of agents, and that thus complainant's chief asset was appropriated to such competing business, and 214 of its most valuable names were so appropriated and used by defendants.

2. PROPERTY—*lists of agents of mail order house as property.* The right of a complainant corporation engaged in the mail order coal selling business, in its list of agents, which came into being only as the result of years of work and great expense, and which when it had come into being, was entirely unique and in itself a source of sales and profit, was a definite, appreciable and valuable property right, and such list, as between the parties to proceedings to enjoin the wrongful appropriation of confidential information, was considered a property.

3. MASTER AND SERVANT—*duty of servant not to disclose or use confidential information.* As employee was bound not to disclose or use confidential matter which he gained by reason of his former employment, and it is immaterial whether as an employee he copied or memorized the secret information which he undertook to use in a competing business; and the use by the latter was a violation of the employer's property rights.

Appeal by plaintiff from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1924. Reversed and remanded with directions. Opinion filed June 17, 1925.

JOHN M. ZANE and DAVID JETZINGER, for appellant.

No appearance for appellees.

MR. JUSTICE TAYLOR delivered the opinion of the court.

On July 6, 1923, the complainant, Boylston Coal Company, a corporation, filed a bill of complaint in the superior court for an injunction to prevent the defendants, David T. Rautenbush and Harold J. Crowe (whose proper name was Bernard H. Brahm), partners doing business as the Supreme Coal Company, from wrongfully appropriating certain confidential information of the complainant as a mail order coal dealer, which had been obtained by Rautenbush while an employee of the complainant.

The bill also prayed for an accounting for unfair trade. Rautenbush filed an answer and an amended answer, and one Ortlund was subsequently made a party defendant, and an order entered that the answer of Rautenbush be adopted as the answer of all the defendants. There was a reference to a master in chancery, and an original and supplemental report by him. He recommended that the bill be dismissed for want of equity. Objections thereto were filed on behalf of the complainant and overruled, and in June, 1924, after exceptions to the master's report had been heard, the chancellor approved the master's report and entered a decree dismissing the bill of complaint for want of equity. This appeal is therefrom.

The bill of complaint alleged that the complainant is a corporation, organized about April 1, 1922, under the laws of the State of Illinois; that the business conducted by the complainant had been conducted for more than eight years prior thereto under the name of the Bernice Coal Company, and on the above-mentioned date one Ruby Levy, who was the owner of the Bernice Coal Company, transferred to the com-

plainant all the business, trade name, lists of customers, lists of agents, good-will and assets of the Bernice Coal Company; that the business of the Bernice Coal Company and, since the date of the transfer above mentioned, the business of the Boylston Coal Company consisted of a mail order business for the selling of coal in carload lots; that the complainant and its predecessor had developed a large and valuable business through a mail order method of selling coal; that in order to carry on said business, the complainant and its predecessor had obtained a large number of agents who resided in different parts of the Mississippi Valley; that the complainant and its predecessor had obtained and located agents at various points in said territory, through whom the sale of coal in carload lots was conducted in the manner of a mail order business; that the number of agents exceeded 8,000 and through those agents there had been developed a large and profitable business; that Rautenbush was employed by the Bernice Coal Company about April 1, 1921, and continued in the employment of that company and its successor until about May 23, 1923; that during the period of such employment he was in charge of the correspondence and advertising matter transmitted to various agents and customers of the complainant and its predecessor, and signed his correspondence as sales manager; that said Rautenbush had knowledge of the lists of agents and customers, and was cognizant of the method used in complainant's business and the form of advertising and correspondence used by it and its predecessor; that on May 23, 1923, Rautenbush left the employment of the complainant and with the defendant Crowe organized the Supreme Coal Company; that thereafter circulars and advertising matter were sent out to various people who had prior to that time dealt with the complainant; that the circulars and advertising matter of the Supreme Coal Company were similar to those used by the complainant; that Rautenbush took

the lists of customers and agents from the complainant, and took, also, models of its correspondence and circulars, and after his association with the Supreme Coal Company, began and was doing business with former customers of the complainant upon the forms of correspondence and with the circulars which he had taken and appropriated from the complainant; that by reason of the similarity of the price lists, correspondence and circulars sent out by the Supreme Coal Company, and the fact that many of its circulars were signed by Rautenbush, who had theretofore signed the correspondence of the complainant while in its employment, a large number of persons who were customers of the complainant were, and would be in the future, misled; that by reason of the acts complained of, complainant has been and will be exposed to great damages and loss of business; that the defendants Rautenbush and Crowe have made large profits, for which they should be required by a court of equity to account to complainant; that the acts of the defendants constitute a continuing trespass on the rights of business of the complainant, which are incapable of estimation in a court of law, and are irremediable in their nature.

The answer of Rautenbush and Crowe admits that the business of the complainant consisted of a mail order business for selling coal, and that it had acquired through Ruby Levy, by consulting telephone books and other lists, names of various people throughout the United States; that the names so acquired were not agents, and a very small percentage of them ever actually sold any coal; that many of the names on the lists held by the complainant were not the agents of the complainant exclusively, but names of people who buy and sell coal for various coal companies. Rautenbush denies that the complainant has any exclusive property in the services of such persons. He admits that he was employed from April 19, 1921, up to and including May 26, 1923, but claims that such employ-

ment was not the result of a written contract and was not for a fixed or definite term. He also admits that he was sales manager during the last fifteen months of that time, and that as part of his duties as sales manager he dictated personally all of the correspondence to the salesmen of the complainant, and became personally acquainted with a large number of them. He denies that he furnished to the Supreme Coal Company a list or lists of the agents and customers of the complainant, or that he ever at any time took or appropriated any lists of customers or agents from correspondence and circulars, or that he at any time began doing business by means of such correspondence and circulars. He alleges that he procured and made up lists of his own by methods entirely distinct and different from those employed by the complainant, and denies that he has in any way interfered with or taken any unfair advantage of complainant in its business. He alleges that the defendant, the Supreme Coal Company, is engaged in the honest business of selling coal through the mail, and that its lists are *bona fide,* and were not acquired from the complainant, and did not include the names of any considerable number of people who had theretofore done business with the complainant, and that the names of such, if any there were, were not more than eight or ten, and were acquired legitimately, being his personal acquaintances; that the lists of the defendant, the Supreme Coal Company, were not copied in whole or in part from a list or lists of the complainant.

The evidence shows, substantially, the following: Ruby and Simon Levy, husband and wife, have been in the coal business for a good many years. They conducted it practically exclusively through the mails. They bought the coal from the mine operators who produced it, and sold it, practically, directly to the consumer. Their agents, or those to whom they sold the coal, were obtained in various ways, chiefly by advertising and the mail. The advertisements were

placed in the chief papers of the large centers, and in a large number of national magazines, and a good deal of literature was sent out by the complainant itself. The actual cost of a good agent, when finally obtained, was approximately $100. That figure was arrived at by taking the amount of money spent in a season and dividing it by the number of good agents obtained within that time. Since the business was started, over $2,000,000 had been spent in getting the lists of agents. The list as finally formed was accumulated as the result of continual advertising and weeding out of names, which in the aggregate amounted to 250,000 persons, until a reduced list of 8,000 or 9,000 had been created. A thousand of those were valuable agents. A name was not considered that of an agent unless he actually sold coal, or had sold more than one car within a season. The 1,000 valuable agents were those who sold enough coal to make the business of the complainant profitable. In obtaining names as prospective agents, there were sent out millions of pieces of literature to the names on various selected lists. In obtaining the names in the first place, mercantile agency books, and sometimes telephone books, were used.

In conducting the mail order business, the complainant kept no yards or places for receiving and storing coal. When it received an order for a carload of coal —and it dealt only in carload lots—it transmitted that order, with shipping directions, directly to the mine. From there the carload of coal went direct to the station or place of destination. When the car of coal arrived at its destination, the agent there would split it up, and the coal would be taken out of the car by the purchasers from the agent. The agent was compensated for his work and trouble by a commission of so much per ton. In some cases the complainant would make a contract directly with the agents, to pay, for example, 75 cents a ton commission. The business had grown to such an extent that in the coal season

of 1922 and 1923 the complainant sold from 15,000 to 20,000 cars of coal.

The defendant, Rautenbush, entered into the employment of the complainant in the spring of 1921, and remained there until May 26, 1923. He first worked as traffic clerk, handling rates and tariffs, and then, about August, 1921, took charge of the correspondence in regard to sales, as sales manager. As the result of taking charge of the correspondence he knew most of the men better than anyone else in the business, according to his testimony. When orders for coal came in from agents they were passed upon by him. The list of the names was kept in drawers in the filing department. Apparently, definite records were kept in regard to each of the agents. There was nothing of importance about the business that he was not familiar with.

In the latter part of April, 1923, the defendant Crowe made a proposition to Rautenbush that he and Crowe and one Ortlund form a coal selling company. Ortlund was a wholesale coal dealer at the time and sold to coal dealers and not to the retail trade, and had no mail order business. Ortlund had been financed by Levy under a certain contract, and shortly afterwards had agreed to sell only to the mail order business of the Bernice Coal Company, which was one of the subsidiaries of the complainant. Apparently, Ortlund, wanting to start a mail order business of his own, entered into negotiations with Rautenbush while the latter was in the employment of the complainant. As the result, the defendant, Supreme Coal Company, was established. At or prior to that time Crowe was an employee of Ortlund. The first letters and circulars sent out by the Supreme Coal Company were sent out under the direction of Crowe, from the offices of the Ortlund Coal Company. They were put in envelopes addressed by Crowe; and that was before Rautenbush left the employment of the complainant. The

bills for the multigraphed letters were paid for by the Ortlund Coal Company. The evidence of Crowe when first examined was that he and Rautenbush in May, 1923, went into partnership under the name of the Supreme Coal Company, and that they took an office on May 1 at 159 North State street; at that time Crowe was working for the Ortlund Company. Crowe further stated that he financed the printing and stationery, and paid the rent in advance, and also put $150 into the bank account after the business was started, but the bills show that they were paid by the Ortlund Coal Company and not by Crowe. Crowe stated that they had a list of names on May 14, 1923, and from that list cards were made out and put into a card index. He said that he got the names himself by sending out to agents of railroads in different towns that he made a list of; that he sent out 1,300 or 1,400 letters; that friends and relatives of his gave him the names. Rautenbush stated that there was no list of names at the Supreme Coal Company when he went there; that he took there himself about 100 or 150 names; that there was a list of names there with some dates on cards that he did not understand; that he had his stenographer throw them away; that those cards originated in the office of the Ortlund Coal Company; that he has since added names to the list that was there, and that it had been growing right along. The list produced by the Supreme Coal Company contained 350 names, and, by comparison, 214 of those were identical with the names on the complainant's list. The names of the two lists that were identical were those of active agents. The list of coal shipments made by the Supreme Coal Company showed that that coal was all shipped to the agents of the complainant. When Rautenbush was examined as to how he got the names that were the same on both lists, he said that some he remembered by having correspondence with them, and that he did not know how some,

by far the greater part, came to be on the list of the Supreme Coal Company.

A summary of the facts as shown by the record may be stated as follows: The list of agents compiled by the complainant was of a peculiar character and quality, and, necessarily, a matter that required more confidence than ordinary customers. In order to carry on the mail order coal business, a list of agents was a fundamental necessity; only by the expenditure of a large amount of money and labor could such a list of agents come into being. A list of agents in the mail order coal business was in the nature of a trade or business secret; the great value of a list of agents in the mail order coal business was lost when disclosed to a competitor, and knowledge of the list of agents of the complainant was obtained by Rautenbush through his employment as sales manager. Rautenbush began to use his knowledge of the list of agents before he left the employment of the complainant, and entered into a competing business, which could not be carried on without such a list. The competing business, by reason of Rautenbush's knowledge of complainant's list of agents, was enabled to begin business practically without any expenditure of money or labor in the creation of a list of agents; the chief asset of the complainant's business, for the creation of which much labor had been expended, was appropriated by Rautenbush to a competing business; Rautenbush, a former employee of the complainant, turned over to himself and his partners, who apparently for purposes of secrecy kept their own names out of the business, 214 names of the complainant's most valuable agents; the list of agents which the complainant had compiled was desired by Ortlund, who was in the coal business, and, under contract, bound to deliver his purchases of coal to complainant, and desired to break his contract, and desired to get secret mail order lists competing with the complainant, and as a result of what was done by the defendants a fair-

sized business was begun by Ortlund and Rautenbush in mail order coal selling with agents of complainant.

From the foregoing, it will be seen that the evidence quite overwhelmingly shows that the defendants undertook to obtain the very essence of the complainant's business by unfair means. The history of their relations and conduct shows that they set about secretly and insidiously to undermine the business of the complainant, and appropriate for their own profit that which constituted the established basis of the complainant's business, and which it had taken years of time and, apparently, approximately $2,000,000 to establish.

The business of the complainant was chiefly advertising, circularizing, letter writing and bookkeeping, and by that work it undertook to make, and did make a legitimate profit through the sale of a large quantity of coal, which, apparently, reached the ultimate consumer at a lower cost than when sold in the general conventional way. A list of good agents, which was gradually accumulated, was the ultimate source and mainspring of the complainant's profit. The right of the complainant in its list of agents, which list came into being only as the result of years of work and great expense, and which was, when it came into being, entirely unique, and in and of itself a source of sales and profit, was a definite, appreciable and valuable property right, more so, perhaps, than most forms of good-will. We are not here concerned with the rights of either side as against the people, but with the rights of each as against the other. Such lists are like stock in trade; they are created at the cost of effort, method, skill and money, to be used in selling coal. As between the parties, the lists of names must be considered, therefore, as property.

In *International News Service v. Associated Press,* 248 U. S. 215, the court said: ''The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary

nature as a property right * * *; and the right to acquire property by honest labor, or the conduct of a lawful business, is as much entitled to protection as the right to guard property already acquired." In that same case, Mr. Justice Holmes said: "Property depends upon exclusion by law from interference." *Davis & Co. v. Miller,* 104 Wash. 444, 177 Pac. 323; *Loven v. People,* 158 Ill. 159; *Witkowsky v. Affeld,* 283 Ill. 557; *Krueger v. Lundeen,* 211 Ill. App. 320.

Further, Rautenbush was bound not to disclose or use confidential matter which he gained by reason of his former employment. *Stevens & Co. v. Stiles,* 29 R. I. 399; *Witkop & Holmes Co. v. Boyce,* 112 N. Y. Supp. 74. And it was immaterial whether as an employee he copied or memorized the secret information which he undertook to use to the detriment of his employer. *Loven v. People, supra; Davis & Co. v. Miller, supra.* The use by the defendants of the complainant's list, or any substantial part of it, such as the evidence shows, was a violation of the complainant's property rights.

In our judgment, the recommendation of the master and the decree of the court were erroneous.

The decree will be reversed and the cause remanded with directions to enter a decree in accordance with the views herein expressed.

*Reversed and remanded with directions.*

O'CONNOR, P. J., and THOMSON, J., concur.