ABC TRANS NATIONAL TRANSPORT, INC., d/b/a ABC Air Freight, Plaintiff-Appellant, *v.* AERONAUTICS FORWARDERS, INC., *et al.*, Defendants-Appellees.

First District (5th Division)    No. 78-533

Opinion filed July 7, 1978.—Modified on denial of rehearing August 3, 1978.

Stephen C. Sandels and John T. Schriver, both of Chicago (McDermott, Will & Emery, of counsel), for appellant.

Drobny & Goode, of Chicago (Irving M. Drobny and Lloyd P. Douglas, of counsel), for appellees.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an interlocutory appeal raising an issue as to whether the trial court abused its discretion in denying a preliminary injunction by which plaintiff sought to restrain defendants from soliciting or servicing its former customers and the return of its personal property.

During the course of a hearing on the motion for a preliminary injunction, the following was revealed: Plaintiff ABC Trans National Transport, Inc. (ABC-TNT), a privately owned corporation, is generally engaged in freight forwarding via land transportation but also has a separately operating division which forwards freight by air known as ABC Air Freight (ABC). ABC acts as an intermediary between those who wish to ship via air and the air carriers and ground cartage companies. Throughout the country, approximately 250 companies compete in the air forwarding business—all of whom employ salesmen to solicit clients and personnel to service them. Salesmen often expend considerable time and effort with prospective clients in order to learn the identity of those responsible for choosing their company's air forwarder, to ascertain their specialized needs regarding air freight and to demonstrate that such needs would be serviced to their satisfaction. Once obtained, a client is then dealt with by the customer service personnel who use information recorded by the salesman on customer cards and rolodex files. The

industry is competitive and, to be successful, a salesman must establish and endeavor to maintain a highly personalized relationship with his clients and the customer service personnel. Because these relationships are important, air forwarders aggressively seek out successful salesmen in their field in the knowledge that if they were to change forwarders, their clients and skilled customer service personnel might in time follow. While such salesmen are lured from one forwarder to another by assurances of higher compensation, such changes generally occur only if the new forwarder is able to deliver the same or better facilities and service.

In 1969, ABC was operating at a loss, so ABC-TNT hired defendant Robert Agnes to act as president of ABC and to exclusively exercise his best efforts on its behalf. Thereafter, Agnes hired defendants Edward Brownstein, David Eades, Carl Cohen, Al Krause, and Bernard Marco—who, along with other ABC personnel, made it a profitable operation in the following major cities Chicago, Philadelphia, Boston, New York, St. Louis, Kansas City, Houston, Los Angeles and Salt Lake City. By 1977, Brownstein was the regional vice president in charge of ABC stations in Chicago, Boston, Kansas City, and Houston; Eades was vice president in charge of the New York station; Cohen was vice president in charge of Philadelphia; and Krause and Marco were vice presidents in charge of Los Angeles. Each of these men, in addition to the supervision of salesmen, district managers and service personnel, also performed some sales functions in soliciting and maintaining clients—particularly those who shipped in volume so that the cheaper airline container rates could be utilized.

In his contract, Agnes received a salary and 10% of ABC's profits, if any. By 1973, ABC did become profitable and a practice soon developed whereby Agnes withdrew his 10% and ABC-TNT withdrew its 90% of the profits after the audit of the preceding year was completed. Agnes, however, objected to ABC-TNT's withdrawal of 90% of the profits on the basis that if such funds were retained by ABC, they could be invested and their earnings would thereby increase his 10% share of profits in succeeding years. In October 1977, he conditioned the renewal of his contract upon the funds being left in ABC and tendered his resignation in the event Leon Mitchell (president of ABC-TNT) and Arthur Brown (owner of a corporation which in turn owned all of ABC-TNT's stock) would not agree to this condition.

At the hearing on the motion for preliminary injunction, Mitchell testified that Brown rejected the demand of Agnes who then indicated that his decision to resign was final; that at the same time, Agnes asked "What if I am not situated or ready to leave on December 31?"—to which Brown said he would keep an open mind; that after Agnes said he had informed the vice presidents about his contract negotiations, he (Mitchell)

told Agnes the corporation also had a right to communicate with those vice presidents—to which Agnes replied, "It's your ball game"; and that during the negotiations Agnes did not complain of a lack of operating capital or of any deficiency in employee benefits. Thereafter, beginning in the second week of October, Oitchell and Brown spoke to each of the vice presidents in terms of filling Agnes's position. Eades, Brownstein and Cohen each assured Mitchell that Agnes's resignation would have no effect on ABC operations in his area, and each stated he was capable of filling Agnes's position but could not do so for personal reasons. On December 14, 1977, Agnes sent a letter to Mitchell confirming his resignation. Subsequently, on January 3, 1978, Mitchell determined that an agreement could not be reached to retain Agnes.

On January 25, 1978, Mitchell was first notified by an ABC employee, Diane Virzi, that defendants and some of their subordinates had set up a competing air forwarder (Aeronautics Forwarders, Inc.) and would walk out en masse. On January 30, 1978, ABC-TNT personnel arrived at the nine major stations; whereupon, Brownstein was fired and Eades, Cohen, Krause and Marco resigned. By the next day, ABC lost 40% of its work force from stations in Chicago, New York, Boston and Los Angeles (the employees at the Philadelphia station remained until February 3, 1978), 50% of its business, and certain of its personal property to Aeronautics.

The chronology of events leading up to this result is as follows: In mid-1976, Marco requested Larry Lindell (who delivered freight exclusively for ABC in the Los Angeles area) to consider delivering freight for Aeronautics. With the approval of Marco and Krause, Lindell made deliveries until mid-1977 for Aeronautics, whose customers were the same as those shipping with ABC, and kept such activities secret, per Marco's request. Lindell was notified concerning such deliveries by a phone installed under the direction of Marco and at ABC's expense in the Los Angeles office of ABC.

In July 1977, Aeronautics's operating authority was revoked by the C.A.B.; however, it was subsequently reinstated through the efforts of defendant Franklin Weiss, who was also retained as ABC's attorney.

Virzi, an ABC employee in the Chicago office, testified that on September 30, 1977, she and two co-workers (Peggy Smith and Georgette Danza) were called into Brownstein's office and, after committing them to secrecy, he told them that ABC-TNT was going out of business; that because ABC-TNT had taken funds from ABC, it too was doomed; that a request of Agnes to give the employees severance pay was denied by Brown; that an alternative company invested in by Krause, Marco and Agnes had already begun in Los Angeles, Boston and Philadelphia and would absorb displaced ABC employees; that Weiss had connections with a New York bank which would provide financing; that Flying Tigers

Airlines had promised a line of credit; that ABC clients such as American Hospital Supply, Texas Instruments, Combined Insurance Co., Max Factor in Salt Lake City, and Polaroid in Boston had been informed of the situation and had agreed to switch to the new company; and that ABC employees across the country were being notified; but because Agnes was under contract, the matter had to be kept secret or he would be in trouble. Brownstein also stated that each employee had to make his or her own decision but that anyone staying is "not going to make it." Moreover, he noted that for those who did stay, it wouldn't "hurt to mess up a few routings of shipments."

About this same time, Marco contacted Lindell and told him that Agnes was going to quit ABC if Brown did not allow Agnes to take over ABC in exchange for 25% of the profits. Marco thereby secured Lindell's promise to resume deliveries for Aeronautics once Agnes and Marco left ABC. Meanwhile, Agnes informed Martin Kusman (ABC's vice president in charge of Missouri) that ABC-TNT was bleeding ABC dry. Kusman testified that Agnes, Brownstein and Krause flew to St. Louis to meet with him. At this meeting, Agnes told him that because of ABC's financial problems he (Agnes) was seeking more control and better employee benefits from Brown during his contract negotiations; that if Brown rejected these demands, he would start up a new company; and that he had amassed $180,000 in cash and secured loan commitments against the new company's accounts receivable.

On October 1, 1977, Brownstein directed Virzi to make a list of ABC's customers and to title it "Christmas List" to avoid questions if anyone passed her desk and took note of this activity. Also, in the month of October, Brownstein asked one of his salesmen, Donald Spadoni, to come into his office and, after requesting that their conversation be kept secret, he told Spadoni that ABC was being grossly mismanaged by ABC-TNT; that ABC-TNT had drained one million dollars per year for three years from ABC; that, as a result, ABC would soon be insolvent; and that it would be in the best interests of the entire ABC staff to join a new freight corporation begun with the personal savings of Agnes, Eades, Cohen, Marco, Krause and himself. In this conversation, Brownstein also said:

> "[T]hat in addition to the $155,000 that they had in cash, they had a commitment from a bank in New York that they could go to with the first four weeks of accounts receivable and they would be guaranteed or had a guarantee that they could get up to $450,000 or 70 percent of the first four weeks' accounts receivable at a rate of interest three percent above prime, up to $450,000.
>
> He also mentioned or said to me—I believe at that point I asked him what the legal repercussions would be, knowing Bob Agnes was on a contract. I can't think of the right word, where he could

be penalized or some legal action could be taken against Bob Agnes.

He said they had an attorney in New York by the name of Franklin Weiss who had been working with them. He had covered everything that was involved, and there was absolutely no way that there could be any legal repercussions to Robert Agnes.

\* \* \* There was no way that \* \* \* any legal means could be taken to stop them and apparently myself and with you, and the other people. That we were all free to leave. There was no way the law could come back, you know, where we would suffer legally. He went on to say that everyone had been talked to and given a firm commitment that they would leave ABC Air Freight and go to work for the new company.

He stressed—this is the important thing of it all—we had to shut down ABC Air Freight by leaving, one day 100 percent throughout the country. This would just destroy ABC Air Freight.

He used the phrase, 'There would be no life left in ABC Air Freight. Nothing left to stay for.' "

Finally, when assured by Brownstein that the benefits would be the same, Spadoni agreed to switch to Aeronautics.

In November 1977, when Kusman telephoned Brownstein in an attempt to talk him out of the plan, the latter replied that he owed loyalty to Agnes and was committed to the plan.

In December of 1977, Marco again requested Lindell (still under contract to ABC) to handle a delivery for Aeronautics. This particular shipment originated in Chicago and, when Lindell arrived to pick it up, it was missing. After telephone calls to the homes of Marco and Krause, he was referred to Brownstein who traced the shipment for him. The next day, another Aeronautics shipment was traced for Lindell by personnel from Brownstein's office. Shortly thereafter, Marco and Krause met with Lindell, promising him Aeronautics stock in exchange for his promise to make deliveries for Aeronautics.

Sometime early in December, Brownstein asked Charles Burgess, district manager for ABC's Houston station, to set up a facility for Aeronautics in Houston as an alternative should negotiations between Agnes and Brown fail. Burgess expressed doubt about the security of such a venture but was assured by Brownstein that "everything had been prearranged. There was no cause for concern in that sense, that all the major accounts that had been the basic support for ABC up until that time were going to convert to Aeronautics. Mr. Hesner [Texas Instruments, Chicago] was mentioned because it did relate to Texas Instruments in Houston. Eddie said that Hesner had agreed to it, wanted to know if I could get Sepaugh [Texas Instruments, Houston] to convert." Finally, in

late December, Krause asked Bud Moorman (district manager of ABC's Kansas City station) to follow Agnes to Aeronautics.

Agnes's contract lapsed, and his resignation became effective on December 31, 1977, and activities concerning Aeronautics accelerated in January 1978. For example, in that month Barbara Crane (an ABC employee under Brownstein's direction) took the ABC addressograph machine from the Chicago office to her home and, using ABC's address plates, prestamped Aeronautics's air bills with the names of shippers and cosignees. Brownstein told Spadoni that things had reached a point of no return and that he (Brownstein) had purchased blank shipping containers which would normally have been labeled "ABC" so that they could be used by Aeronautics; and Agnes promised Lindell 10,000 shares of Aeronautics stock and reimbursement for employee's medical insurance should Lindell agree to deliver for Aeronautics. Also, in early January, Brownstein met with Charlie Sepaugh of Texas Instruments (Houston) which represented 80% of ABC's Houston business, and informed him that ABC-TNT was taking money from ABC in such amounts that ABC would become insolvent. He told Sepaugh that Aeronautics was set up to employ ABC's work force and to service ABC's customers and that the transition from ABC to Aeronautics would be accomplished by a massive walkout on a future date. Although Brownstein assured Sepaugh of the same fine service with Aeronautics, Sepaugh refused to commit himself except to say that he did not care for the prospect of his shipments being tied up by a walkout.

On January 9, 1978, Brownstein informed certain of his staff that their last day at ABC would be Friday, February 17, and that they would be reporting for work at Aeronautics on Monday, February 20. He told them that "By doing it this swiftly and quickly we could just destroy ABC Air Freight. It would be completely destroyed. There [is] no way they could act. They [will] be out of business." At this point, Brownstein told Spadoni he would be terminated on February 3 with two weeks severance pay so that he could spend 100% of his time inducing his customers to change from ABC to Aeronautics.

On January 13, Smith told Virzi that the customer cards from ABC's Chicago station were taken home by Crane and would not be returned. Between January 13 and 27, Virzi observed Danza use "white out" to erradicate ABC's name from daily station report forms and xerox the form repeatedly.

Brownstein, on January 16, informed Tony Ill (an ABC salesman), Crane and Spadoni that the termination date had been advanced to February 3; but, because American Hospital Supply wanted to change over to Aeronautics as of the first of the month, Smith and Crane would

have to be set up in a mobile trailer office to service their business. Furthermore, during the week of January 16, one of ABC's customers was telephoned by an ABC salesman who stated, "ABC Air Freight merged with Aeronautics [therefore] disregard their air bills and their phone number." Thereafter, this client was billed by Aeronautics for the shipment of air freight.

On January 18, Brownstein informed Moorman that several clients had committed themselves to Aeronautics; *i.e.*, Columbia Records, Merk Sharpe & Dohne, Texas Instruments and Combined Insurance, and that he and Agnes had worked very hard setting up Aeronautics and now sought Moorman's assurance that he was with them. Brownstein remarked that "ABC would be decimated by the exodus" and asked Moorman to get commitments from his customers and to set up an Aeronautics office so that supplies could be sent to him. Moorman then asked what he should tell his customers, to which Brownstein replied:

> " 'That's up to you, but in Boston and Philadelphia, they were telling the people that ABC had been taken over by a new company, that Mr. Brown had wanted to get out of the air freight business.' * * * I said, 'I think that's a little risky, don't you?'
>
> He said, 'Well, it's your customers. You put it the way you want to, but that's just * * * one of the stories they are using in one of the stations.' "

On January 19, Virzi observed Smith inventorying ABC's office supplies in the Chicago office and, upon inquiry, was told by Smith that she was going to order a duplicate set for Aeronautics from the same supplier. Thereafter, Virzi signed requisitions for the supplies and ABC paid for them. On January 21, Krause told Moorman that he had found office space for Aeronautics and again sought reassurances from Moorman that he would be able to swing his major accounts to Aeronautics.

On January 23, when Agnes heard of Virzi's decision to stay with ABC, he telephoned to say that she was making a mistake because ABC was going out of business, and he told her that " 'for your friends' sake you had better not tell anybody because they are involved. It is too late you are hurting their careers. You are hurting your friends. If your friends are important to you as you think, then you better not say anything.' " At about the same time, Virzi had a conversation with Peggy Smith, as follows:

> "Peggy, you know I am going to stay with ABC. You have got a telephone book that I want to know if you are going to take with you.
>
> She said, 'Yes, I am.'
>
> I need those numbers as well as you do for ABC Freight's sake. I

> want to copy them for you. Do you mind if I get my own phone book and copy them from your book?
>     She said, 'Yes.' "

Thereafter, on January 27, Brownstein told Virzi that he was ready to leave but that other stations such as Los Angeles require more time. He noted, however, that he was prepared to "get up and leave" should anything happen to him.

All but one of the sales and customer service employees of ABC in Boston resigned on January 31, and all of the sales and customer service employees of ABC in New York also resigned on that day. With the exception of one salesman, all of ABC's sales and customer service personnel in Los Angeles also resigned, and in Chicago all the sales and customer service personnel resigned with the exception of one salesman and one customer service employee. ABC lost no employees or customers in St. Louis, Kansas City and Houston, which were managed by Kusman, Moorman and Burgess, respectively—each of whom remained with ABC.

Following the resignation and departure of the Chicago employees, the handwritten office telephone book with business listings and the 1978 Industrial Manufacturers' Directory for that office were missing and have never been found or returned.

In ABC's Los Angeles office, the rolodex card file was taken from ABC's office at the time of the January 31 employee walkout. This file contained customer names and addresses, the identity of personnel to contact for air freight business for each customer, the identity of key airline personnel, the home telephone numbers of key airline and customer personnel and other customer information. The rolodex file was observed by an ABC employee on February 7 in Aeronautics's Los Angeles office. In addition, a checkbook for an ABC checking account containing its funds, which had been kept for ABC by Krause and Marco, was also missing after the employee walkout and has never been found or returned.

Following the walkout of employees on February 3 from ABC's Philadelphia office, customer cards and negotiable international air bills were discovered to be missing and have never been found or returned.

After the departure of employees from ABC's New York office, it has been discovered that all ABC's addressograph plates for New York customers, along with two rolodex files of customer cards, were missing. One of the rolodex files has been returned and another piece of ABC's missing property; *i.e.*, a hand truck, has been seen in Aeronautics's New York station.

ABC-TNT's financial director testified that ABC-TNT was a profitable business without regard to the 90% of ABC profits withdrawn after the preceding year's audit was completed, and that such a withdrawal did not

deprive ABC of sufficient operating capital. Mitchell then testified that, at the time of hearing, some new employees had been hired by ABC but that most of the vacated positions were being filled on a care-taking basis by ABC-TNT employees who were unschooled in the air freight forwarding business. Moreover, both witnesses testified that since the major clients in the affected cities of Chicago, Philadelphia, Boston, Los Angeles and New York were shipping with Aeronautics, ABC's revenues in these areas were cut in half and its airline charges increased by 7%. Lastly, Mitchell testified that ABC, in the fall of 1977, deposited half a million dollars into certificates of deposit at the Banco Popular of Puerto Rico in New York, which institution lent Aeronautics $100,000 as of February 16 against its accounts receivable.

Brownstein was called under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60) as an adverse witness and testified to the following: In September 1977, he decided to follow Agnes if the latter's contract negotiations with ABC failed and, by October, he told his staff of this possibility and of his desire to have them with him should he resign. He admitted that Crane did procure office supplies for Aeronautics but that he, not ABC, paid for them. Also, before he was terminated by ABC, he made arrangements for a mobile trailer to be used as an Aeronautics station for certain of Aeronautics's printing needs and for Crane to prestamp Aeronautics's air bills. He stated that prior to his departure from ABC he did not solicit customers for Aeronautics. He did, however, tell Sepaugh of Texas Instruments in Houston that he would be following Agnes and that, as he hoped his next employer would provide quality service, he would like the opportunity after changing jobs to solicit Sepaugh's business. He added that his decision to leave was precipitated by ABC's unhealthy financial prognosis brought about by ABC-TNT's withdrawal of funds. Concerning Combined Insurance, he said he told its representative that he was following Agnes—who was the only executive he trusted and requested the opportunity to solicit its shipments when he moved to another air forwarder.

Brownstein also testified that he learned for the first time on January 26, 1978, that Agnes had acquired an ownership interest in Aeronautics, and Agnes did not offer him a position at Aeronautics until after he (Brownstein) was fired by ABC on January 30. At that time, Brownstein was empowered by Agnes to offer jobs to his former staff and, when he did so on the evening of January 30, they were immediately accepted. The next day, he distributed prestamped Aeronautics's air bills for the first time to those who had formerly shipped with ABC.

Brownstein testified that Aeronautics's gross revenues per day were $20,000, so annual revenues were projected to be $7,000,000. He

acknowledged that all the outbound business at Aeronautics's Chicago station came from former ABC customers and that all but two of the 29 employees who left ABC are now employed by Aeronautics.

At the close of plaintiff's evidence, the trial court granted defendants' motion to deny the preliminary injunction, basing its ruling upon its findings that plaintiff had made a sufficient recovery to compete with Aeronautics and that an injunction, if issued, would put Aeronautics out of business without necessarily benefiting plaintiff.

OPINION

Plaintiff contends that the trial court's refusal to issue a preliminary injunction was an abuse of discretion. We agree.

■■ "The sole role of an appellate court in addressing the grant or refusal of an interlocutory decree is restricted to a determination of whether the trial judge correctly exercised his broad discretionary powers. [Citation.]" (*Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 690, 329 N.E.2d 414, 416-17.) Moreover, as it is not the purpose of a preliminary injunction to determine controverted rights or decide the merits of a case, a court of review looks to the sufficiency of the evidence only for the limited purpose of ascertaining whether the trial court's discretion has been abused. *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795.

■■ A preliminary injunction will issue where plaintiff establishes that (1) a certain and clearly ascertained right needs protection; (2) irreparable injury will ensue without the protection of an injunction; (3) the remedy at law is inadequate; and (4) there is a likelihood of success on the merits of the case. (*Bromberg v. Whitler* (1977), 57 Ill. App. 3d 152, 372 N.E.2d 837.) In meeting this burden, it was said in *Wessel Co. v. Busa:*

> "All that is necessary is that the petitioning party raise a fair question as to the existence of the right claimed, lead the court to believe that he probably will be entitled to the relief prayed for if the proof should sustain his allegations, and make it appear advisable that the positions of the parties should stay as they are until the court has had an opportunity to consider the case on the merits. [Citation.]" (28 Ill. App. 3d 686, 690, 329 N.E.2d 414, 417.)

Once this burden is met, the equitable doctrine of the balance of the equities or conveniences between the parties may be applied whereby the trial court determines whether the burden upon the defendant, should the injunction issue, outweighs the benefit to the plaintiff; however, such doctrine is inapplicable where defendant's "actions were done with full knowledge of the plaintiff's rights and with an understanding of the consequences which might ensue." (*Wilson Concrete Co. v. County of*

*Sarpy* (1972), 189 Neb. 312, 316, 202 N.W.2d 597, 599. Accord, *Stuart v. Lake Washington Realty Corp.* (1956), 141 W.Va. 627, 92 S.E.2d 891.) The defendant, by acting swiftly, cannot deprive the court of the right to compel restoration of the status quo as the duty of the courts is to protect rights, and innocent complainants ought not suffer the loss of their rights because of the expense to the wrongdoer. (*Gulick v. Hamilton* (1919), 287 Ill. 367, 122 N.E. 537; *Welton v. 40 East Oak St. Bldg. Corp.* (7th Cir. 1934), 70 F.2d 377.) In this regard, status quo has been defined as the last actual, peaceable, uncontested *status* which preceded the controversy. *Wolf & Co. v. Waldron* (1977), 51 Ill. App. 3d 239, 366 N.E.2d 603.

■■■ " '[A] court of equity [which] concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right * * *; and the right to acquire property by honest labor, or the conduct of a lawful business, is as much entitled to protection as the right to guard property already acquired.' " (*Boylston Coal Co. v. Rautenbush* (1925), 237 Ill. App. 550, 559-60.) Moreover, "[t]he malicious inducement of an employee to terminate his existing employment and enter the employ of another gives rise to a cause of action [citation], and the fact that the contract of employment is terminable at will does not bar recovery. [Citation.]" (*B. R. Paulsen & Co. v. Lee* (1968), 95 Ill. App. 2d 146, 153, 237 N.E.2d 793, 796.) While acting as an agent or employee of another, one owes the duty of fidelity and loyalty; accordingly, a fiduciary cannot act inconsistently with his agency or trust; *i.e.*, solicit his employer's customers for himself, entice coworkers away from his employer, or appropriate his employer's personal property. (*Lind v. Carson* (1958), 16 Ill. App. 2d 542, 148 N.E.2d 814 (abstract); *Duane Jones Co. v. Burke* (1954), 306 N.Y. 172, 117 N.E.2d 237; *United Board & Carton Corp. v. Britting* (1959), 63 N.J. Super. 517, 164 A.2d 824.) However, "[i]t is not necessarily a breach of duty for an agent to form a rival concern and purchase machinery for it while working for his principal [citation], though it would be for an agent to continue to work for his principal after a rival corporation which he also served as agent begins business." (*James C. Wilborn & Sons, Inc. v. Heniff* (1968), 95 Ill. App. 2d 155, 163, 237 N.E.2d 781, 786.) Thus, as a means of fostering free enterprise, the employee who gains general skills and knowledge and forms relationships with customers and coworkers during the course of his employment may use such skills, knowledge and relationships to compete with his former employer once the employment is terminated (*Professional Service Corp. v. Johnson* (1942), 316 Ill. App. 431, 45 N.E.2d 191) but may not compete while still employed as his employer who, lulled by trust in the employee's fidelity and loyalty, is deprived of the opportunity to compete with that employee (*Sanitary Farm Dairies, Inc. v. Wolf* (1961), 261 Minn. 166, 112 N.W.2d 42).

Turning to the question of relief where a betrayal of confidence and trust has been demonstrated, we note that equity will prevent the continuance of such conduct in a proper case and will compel the former employee to turn over the gains to one equitably entitled thereto. (*Lind v. Carson.*) As to whether a case is a proper one for equitable relief, it has been said:

> "The existence of a remedy at law does not deprive equity of its power to grant injunctive relief unless the remedy is adequate; *i.e.*, the remedy at law must be clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy. [Citations.] Thus, the fact that plaintiff's ultimate relief may be a money judgment does not deprive a court of equity the power to grant a preliminary injunction." (*K.F.K. Corp. v. American Continental Homes, Inc.* (1975), 31 Ill. App. 3d 1017, 1021, 335 N.E.2d 156, 159.)

In *United Board & Carton Corp. v. Britting,* on facts similar to those in the case at bar, it was observed that the loss of future profits resulting from the wrongful appropriation of plaintiff's customers were not readily calculable and, accordingly, that injunctive relief was proper.

Here, the recitation of the trial court's findings in support of its denial of the preliminary injunction are equivocal regarding the questions of whether plaintiff possessed a right in need of protection and whether plaintiff had demonstrated a likelihood of success on the merits. While defendants, in their brief, admit that to actually commence business and to obtain orders from plaintiff's customers while they were still in its employ is actionable under Illinois law, they contend that plaintiff failed in its burden to show a right in need of protection or a likelihood of success, as they maintain that they did not solicit its customers and that it was an industry practice for clients and customer service personnel to follow salesmen, who are free to leave at will, when they change air forwarders.

The record discloses, however, that by October 1977, while still in plaintiff's employ, Agnes, Brownstein, Marco, Cohen, Eades and Krause invested in Aeronautics, a competing air forwarder; that Krause and Marco had obtained the services of a cartage firm under exclusive contract to plaintiff to make deliveries for Aeronautics; that Krause and Marco sanctioned the use of plaintiff's facilities and funds to provide communication between Aeronautics and this cartage firm and that the cartage firm was delivering shipments for Aeronautics to companies which were customers of plaintiff. In addition, there was evidence that Brownstein informed his sales and service staff that plaintiff would soon be insolvent; that if any of the staff remained with plaintiff they would soon be unemployed; that plaintiff's major accounts had been informed of

its financial problems and had committed themselves to switch to Aeronautics; that plaintiff's employees across the country had been told of the pending insolvency and had agreed to join Aeronautics; that Weiss, plaintiff's attorney at this time, was taking steps to protect all those who went to Aeronautics from legal repercussions; and that plaintiff would be destroyed by a massive walkout. Such activities were occurring at about the same time that Brownstein, Cohen and Eades gave assurances to Mitchell that Agnes's resignation would not have a deleterious effect upon business in their areas. It is also disclosed that by December 1977, Brownstein and members of plaintiff's Chicago staff had traced lost Aeronautics shipments, and Brownstein not only had assured plaintiff's district managers that Aeronautics would be an immediate success, as the major portion of plaintiff's customers up to that point were already committed to Aeronautics, but he had also sought further commitments from the district managers that they could swing their customers to Aeronautics.

During January 1978, plaintiff's facilities, funds and personal property had been used by its employees under the direction of Brownstein to prestamp Aeronautics's air bills, to furnish office supplies and airline containers to Aeronautics, and to prepare Aeronautics's daily station report forms. Furthermore, Brownstein continued to meet with plaintiff's customers in order to obtain commitments for Aeronautics on the basis that plaintiff was in financial trouble and would suffer a massive employee walkout. He also had meetings with plaintiff's employees to inform them of the nationwide plan to leave work on a certain Friday, and to devastate plaintiff's ability to compete by simply reporting to Aeronautics on the following Monday morning.

Brownstein admitted securing equipment and supplies for Aeronautics while still employed by plaintiff but denied that plaintiff's funds were used for this purpose. He also admitted that he told plaintiff's staff he would be following Agnes; that he expressed the hope that circumstances would then allow him to ask them to join him; and that he had informed plaintiff's clients of its unhealthy financial prognosis and its management by untrustworthy executives while asking them for the opportunity to solicit their business once he had changed jobs. Plaintiff's financial director testified to the contrary concerning its condition, stating that ABC-TNT showed yearly profits since 1974 without regard to the withdrawal of Agnes's 10% and ABC-TNT's 90% of ABC's profits for each preceding year and that such withdrawals did not deprive ABC of operating capital.

During the course of his testimony, Brownstein stated that clients and customer service personnel make a practice of following salesmen whenever they change air forwarders. Kusman, however, testified that

when he had in the past changed forwarders, it took him three years to woo the majority of his former customers to his new employer.

Defendants admitted during oral argument before this court that immediately after the walkout, Aeronautics had projected annual revenues of $7 million and that all of its business was from accounts formerly doing business with plaintiff. We believe these and the other facts set forth above appear to contradict Brownstein's assertion that there was no solicitation of plaintiff's customers and employees for the benefit of Aeronautics while he was still in plaintiff's employ. The immediate income of Aeronautics was derived in the main, if not entirely, from former customers of plaintiff, and this is corroborative of the testimony of numerous witnesses that the individual defendants were simultaneously performing services of some kind for Aeronautics before their employment with plaintiff was terminated, in violation of their duty of loyalty. In effect, the testimony indicates that defendants used the predisposition of clients and ABC personnel to their advantage by portraying that ABC was soon to be insolvent and using plaintiff's facilities and funds to channel the desire for uninterrupted shipping on the part of plaintiff's customers and employment security on the part of ABC's employees to the benefit of Aeronautics. This was done through statements that plaintiff was financially insolvent and that Aeronautics would be an immediately successful enterprise offering the same fine service and employee benefits that plaintiff had rendered. In addition, plaintiff's customer cards, rolodex file cards and directories were taken, so that in the event any employees remained after the walkout, plaintiff could not as effectively service the needs of its remaining clients or entice the return of former customers.

■■ The trial court found that plaintiff's remedy at law was adequate and that any damages to which it might be entitled could not be collected if an injunction issued, as it would put Aeronautics out of business. We believe the denial of the preliminary injunction on the basis of such findings was an abuse of discretion. The record and the protracted arguments in the briefs demonstrate the difficulties in ascertaining with any degree of certainty the amount of damages resulting from the loss of profits. Moreover, defendants' ability to later respond in damages should not, in our opinion, preclude the entry of a preliminary injunction if it is otherwise proper. See *K.F.K. Corp. v. American Continental Homes*.

■■ In light of the foregoing, we believe that at the close of plaintiff's case the trial court was presented with a prima facie showing of the elements required in *Bromberg v. Whitler*; namely, that plaintiff had the right to be free of interference with its customers by those in its employ; that this was a right that was entitled to protection until the merits of this case are disposed of; that the protection of this right should include

provision for the return of any personal property wrongfully taken from it; and that plaintiff's evidence demonstrated a likeliness of success on the merits of this case.

■■ We must next consider whether in light of the foregoing the trial court abused its discretion in applying the equitable doctrine of the balance of equities and conveniences between the parties in denying the issuance of the preliminary injunction. We believe that it did. As stated in *Welton v. 40 East Oak St. Bldg. Corp.* (7th Cir. 1934), 70 F.2d 377, 381:

> " '* * *It is hard to see how anyone can claim any immunity for a tort on the ground that it was innocently done, when at the time of doing it he knew his right to do it was disputed by the person affected.' [Citation.]"

Here, while Brownstein told Spadoni that he (Brownstein), Agnes, Marco, Eades, Cohen and Krause had consulted Weiss regarding their rights in this matter and the possibility of legal repercussions and that Weiss stated their activities were not actionable, he (Brownstein) and Agnes continuously stressed the need for secrecy and warned of undesirable consequences should the silence be broken.

■■ In view thereof and considering the totality of the circumstances outlined above, we believe that the trial court abused its discretion in granting defendants' motion to deny the preliminary injunction.

Plaintiff, relying principally upon *Armour & Co. v. United American Food Processors, Inc.*, requests that, in the event we find such an abuse of discretion, we remand with directions to enter the preliminary injunction. This we will not do.

In *Armour*, at the close of plaintiff's case, the court granted defendants' motion to deny a preliminary injunction. On appeal, it was held that plaintiff had made out a prima facie case and the matter was remanded with instructions to enter the injunction pending disposition on the merits. We note, however, that in *Schlicksup Drug Co. v. Schlicksup* (1970), 129 Ill. App. 2d 181, 186-87, 262 N.E.2d 713, 715-16, the court said:

> "As a prerequisite to the issuance of the preliminary injunction, the plaintiff was required to establish the probability of the ultimate success on the merits of the case, as well as the immediate need for the injunction to preserve the status quo and to prevent irreparable injury to its rights or property. Where no answer has been filed, the injunction may be issued based solely on the sufficiency of the complaint, but where an answer has been filed, both the answer and the complaint, must be considered. If the answer contains denials of material allegations of the complaint, a hearing on those matters must be had before the injunction may issue. [Citations.]"

We are unable to determine whether, in *Armour*, an answer was filed

containing denials of any of the allegations of the complaint. The opinion, however, cites *Schlicksup* in another context, and thus we assume that, in *Armour*, there was no pleading denying the allegations of the complaint. Here, by verified answer, defendant has made such denials and, in the light thereof, we believe a hearing should be had on those matters before the injunction may issue. *Schlicksup.*

For the reasons stated, the judgment appealed from is reversed and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

LORENZ and MEJDA, JJ., concur.