2025 IL App (1st) 220720-U

SECOND DIVISION
November 12, 2025

No. 1-22-0720

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ARK SHIPPING, INC., an Illinois corporation, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County |
| | ) | |
| BIREN PAREKH, PURNIMA PAREKH, POONAM | ) | 17 CH 427 |
| PAREKH, VISHAL PAREKH, PBV SHIPPING USA | ) | 19 L 966 (cons.) |
| INC., an Illinois corporation, and MP CUSTOM | ) | |
| BROKERS, INC., an Illinois corporation, | ) | Honorable |
| | ) | Franklin U. Valderrama |
| Defendants. | ) | Allen P. Walker |
| | ) | Judges Presiding |
| (Biren Parekh, Defendant-Appellee.) | ) | |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*: Affirmed in part, reversed in part, remanded. Court did not abuse discretion in discovery rulings. Summary judgment on lost business income affirmed. Court erred in granting summary judgment on claim for disgorgement. Sanction award in favor of defendant was abuse of discretion.

¶ 2   Plaintiff Ark Shipping, Inc. (Ark) is a shipping company that sued its former top employee, Biren Parekh (Biren), for starting a direct competitor that operated out of Biren's home for nearly the entire time Biren headed up Ark. To prove that this competitor company stole either existing or prospective clients from Ark with Biren's help, Ark sought discovery

from the competing business and Biren's family members. Ark's many and varied attempts to obtain this discovery failed, in no small part due to abuses of the discovery process by Biren.

¶ 3    Absent any proof that the competitor company actually stole business, the circuit court entered summary judgment in Biren's favor for lack of damages. The court later awarded Biren a sanctions award against Ark of more than $300,000, concluding that the lawsuit was frivolous. Ark appeals the discovery orders, the entry of summary judgment, and the sanctions award.

¶ 4    We reluctantly affirm the discovery rulings, not because Biren did not abuse the discovery process—he clearly did—but because Ark, despite its considerable efforts, did not effectively place this abuse before the court. We cannot trace any unfairness to an abuse of the court's discretion. And thus we affirm, just as reluctantly, the entry of partial summary judgment due to Ark's inability to prove lost-business damages for Biren's breach of fiduciary duty.

¶ 5    But we reverse the entry of summary judgment insofar as Ark sought the remedy of disgorgement—the forfeiture of Biren's compensation during the time he breached his fiduciary duty—an independent category of damages for breach of fiduciary duty. There is more than sufficient evidence that Biren breached his fiduciary duty to Ark, precluding summary judgment.

¶ 6    We likewise reverse the award of sanctions against Ark. The notion that Ark lacked a good-faith basis for this lawsuit is meritless. Ark discovered smoking-gun evidence that its top employee, Biren, was diverting business solicitations to a competitor operating out of Biren's own home; Ark had more than a good-faith basis to sue for breach of fiduciary duty and related claims. The sanctions award was a clear abuse of discretion. We remand for further proceedings.

¶ 7                                    BACKGROUND

¶ 8                                 I. Factual Background

¶ 9      Ark, the plaintiff here, is an Illinois-based freight-forwarding and logistics company founded in early 1999. It is part of a much larger international group of logistic and shipping companies originating in and around India whose parent is an Indian company, CKB Global Logistics PVT, Ltd. (CKB). One of the principals of CKB is a man named Anand Sheth.

¶ 10     Biren Parekh, the defendant, has worked in the freight and logistics business for most of his professional life—some 40 to 50 years. The non-appellee defendants are Biren's wife Purnima, his daughter Poonam, and his son Vishal.

¶ 11     In the mid-1990s, Biren moved to the United States to work with a different shipping company. He ended his employment with that company because they wanted him to relocate to Canada. Looking for a new opportunity in the U.S., Biren contacted Anand Sheth, who as noted was one of the principals of the Indian company CKB.

¶ 12     After some discussion, CKB hired Biren and charged him with opening Ark—the Indian company's first foray into the American market. Under the agreement, Biren would essentially be in complete charge of Ark's start-up. In return, Biren was made branch manager (and in 2005, vice president) and given control over the operations and development of Ark. At all relevant times, whatever his title, Biren was the highest-ranking person working at Ark. Ark was incorporated in February 1999.

¶ 13     Unbeknownst to CKB, however, in August 2000—a year and a half after CKB hired Biren to start up and run the day-to-day operations of Ark—Biren started another freight-forwarding and logistics company based out of his home in Roselle, known as PBV Shipping USA, Inc., or "PBV." Biren was registered with the Illinois Secretary of State as the president

and registered agent for PBV. Biren and his family would later insist that only Biren's wife Purnima had any role in PBV, that Biren was named PBV's president solely for cultural reasons.

¶ 14    In 2010, Biren's daughter, Poonam, would start another company, MP Custom Brokers, Inc. (MP) to engage in custom brokering—a service closely related to the freight-forwarding and logistics services Ark provides. (Though Ark does not provide custom brokering services, it partnered with another company that did. Ark alleged that PBV and MP followed that same model, partnering up to provide a full-service competitor to Ark.)

¶ 15    For more than 16 years, while Biren served as its highest-ranking employee in the U.S.—first as branch manager and then, in 2005, its vice-president—Ark was unaware that Biren and members of Biren's immediate family owned and operated these competitors. But in October 2016, principals at the Indian parent company, CKB, discovered that Biren had been secretly forwarding Ark's business emails to his wife's and daughter's company. Ark attached these emails to various pleadings and discovery requests as "Group Exhibit A," summarized below:

> April 29, 2016: A company called Rev Hoopes Trucking emailed Ark about a potential business opportunity. Less than two hours later, Biren forwarded this email to PBV with this note: "Pam, see if you like."

> June 23, 2016: A Chinese company emailed Ark about a quote for a certain shipment. The next day, Biren forwarded the email to PBV, writing: "See if you have any interest," further advising to "Pls check power of attorney and how payment will be made. As this is from China."

> July 29, 2016: A company that appears to be named Wholesale Dental Supply confirmed a business transaction by email. The same day, Biren forwarded the email to PBV with this note: "Pam, another importer for you."

August 24, 2016: A company named Pacific Blue Cargo emailed Ark about a new logistics company it was creating and sought an agency agreement with Ark. Twelve minutes after receiving it, Biren forwarded the email to PBV, writing: "New contact to develop."

September 13, 2016: Biren forwarded an email exchange between Ark and a company known as Kobawala. Biren wrote to PBV in the forwarded email: "Pam, Kobawala of temple is importing lot. Let us talk to him and see what we can do." Ark further alleges that this forwarded email "shared Ark's confidential pricing for Kobawala International with PBV, resulting in Ark not getting this business which would have generated $200 profit per container."

September 14, 2016: A company named Prakash Freight Movers sent an email to Ark complaining of Ark's failure to timely provide a quote, causing Prakash to lose a bid on the work. The email ended with, "Hope we will get your best cooperation next time." Biren forwarded this email to his wife with this note: "This is a good forwarder. Pls discuss with me before you call them." Ark alleges not only that Biren "shared confidential pricing information and quote" with PBV but that Biren "intentionally delayed submitting a quote so Ark could lose this business, which it did," thus giving "an opportunity for PBV to take over this business."

September 21, 2016: Ark received email correspondence from Earth Relocation. Within minutes, Biren forwarded this email to PBV, writing: "Pam, Pls discuss with me. Mr. Samir Shah is specialized in 'House Hold Goods' and looking for a Custom broker in Chicago as most of his shipments are for Chicago, Il. Let us discuss and work out a plan."

November 8, 2016: Ark received an email from Voltrans Logistics regarding a quote on a shipment. Later that day, Biren forwarded the email to PBV with this note: "Pam, you may attend."

November 8, 2016: Ark received a request for a quote from a company called GCX Logistics. Biren forwarded the email to PBV, adding: "This is a good contact for export." Ark alleges that "Biren never submitted a quote to GCX Corporation, spoiling Ark's opportunity to obtain a new customer."

¶ 16 In another batch of documents Ark identified as "Group Exhibit B," which Ark filed under seal due to their confidential pricing information, Ark produced further examples:

August 29, 2016: Biren forwarded Ark's business information on import customer Epilay Inc. to PBV. At the time, "Ark was making a profit of $250 a month" on that business but, since that forwarded email, "Ark has not done any further business with Epilay," though Epilay "has since done business with PBV."

August 23, 2016: Biren forwarded an email with "confidential information regarding Ark's charges for various services for Arvind Ltd including its profit margin" to PBV "to give [PBV] the ability to quote lower prices and take the business away from Ark."

May 4, 2016: Biren forwarded an email to PBV that "shared Ark's confidential quote" to a prospective customer from China. Ark alleges that Biren, on Ark's behalf, "placed improper restrictions, i.e. payment upfront, that does not apply to [World Cargo Alliance] members intentionally spoiling this business opportunity of $250 profit per month and opening the door for PBV to take this business."

November 9, 2016: Biren forwarded an email to PBV that "shared Ark's confidential pricing information" on a "pre-existing customer, Prakash Freight Movers Limited, allowing PBV to quote a lower price and get this business." Ark alleges that Prakash "has not done business with Ark since then."

November 7, 2016: Biren forwarded to PBV an "entire email string regarding a potential import customer Elite Construction which contained trucking rates facility contact details by which PBV could then quote lower rates." At that time, Ark alleges, Elite was "importing 10 containers a month, generating a profit of $4,000 to $5,000 a month for Ark." Ark alleges that it "has not done business with Elite Construction since March 2017."

August 29, 2016: In a forwarded email, "Biren shared Ark's customer details" with PBV "so PBV could quote a lower bid and get this business and future business from Ark's potential client, Psyllium Labs LLC, which never became a customer of Ark."

August 10, 2016: Biren forwarded an email to PBV "about Ark's customer Caraway Tea Company for the sole purpose of having PBV take this customer from Ark."

July 29, 2016: Biren forwarded an email to PBV about Freightcan Global, "sharing Ark's import details" so that "PBV could undercut Ark's pricing and approach Freightcan Global for future business."

July 25, 2016: Biren "[i]ntentionally did not submit a quote for potential customer DanNay Logistics Pvt Ltd and instead diverted the inquiry with specifics to PBV" in a forwarded email. Ark alleges that this lost business equated to "$225 profit per shipment."

July 15, 2016: Biren "[i]intentionally did not submit a second quote for potential customer DanNay Logistics Pvt Ltd and instead sent the full inquiry details to PBV." As a result, Ark alleges, Ark did not secure this "potentially long term business relationship," "which would have generated a profit of about $900 a month for two to three shipments a month."

June 24, 2016: Biren forwarded an email to PBV that "shared confidential pricing information from potential customer Shipco Transport." Ark alleges that it did not obtain this business.

June 17, 2016: Biren forwarded an email to PBV that "shared Ark buying rates and customer details with PBV."

June 9, 2017: Biren sent an email to PBV that "shar[ed] Ark's quote for potential business with Mira Trans LLC" so that "PBV could quote a lower price." Ark alleges that it did not obtain this business.

June 3, 2016: Biren sent an email to PBV "regarding Ark's potential client, Neptune Supply Chain Technology Shanghai, Limited, containing all the background information on this potential long term business relationship." Ark alleges that this business "would have generated a profit of $200 per container for 10-12 containers a month," or approximately "$2,000 to $2,400 a month" in profit. Ark alleges that PBV ultimately obtained this company as a client.

May 23, 2016: Biren sent an email to PBV regarding potential business with Alireza Holding Company. Ark alleges that Biren "never submitted the requested quote for this long term business opportunity" on Ark's behalf, "which would have generated a profit of $50,000 per each 6 month period."

October 3, 2016:  Biren forwarded an email to PBV "regarding a potential long term and repeat" customer, Shree Jalaram Mandir. Ark alleges that Biren "never submitted the requested quote for this particular transport which would have generated a profit of $250 for Ark on this particular job."

¶ 17    When confronted by Anand Sheth and others at CKB with this evidence, Biren resigned from Ark, effective November 30, 2016. Settlement discussions ensued but broke down.

¶ 18                                    II. Litigation

¶ 19    In January 2017, Ark filed suit in the chancery division, seeking injunctive relief and claiming damages for breach of fiduciary duty, fraud, and other business-related torts against Biren, his family, and their companies, PBV and MP. After an early motion to dismiss, Ark non-suited Biren's family members and the companies. After a second round of motion practice, the court dismissed the fraud claim with prejudice and the tortious-interference claim without prejudice; Ark later voluntarily dismissed the tortious-interference claim.

¶ 20    Ark then filed a second amended verified complaint in chancery alleging *only* claims for breach of fiduciary duty and accounting. Ark would later refile the tortious-interference claim in the law division as case 19 L 966; that case was consolidated with the chancery action.

¶ 21    So at the end of the day, Ark proceeded against Biren for claims of breach of fiduciary duty, tortious interference with business expectancy, and accounting. Ark sought compensatory damages for the business Biren "stole" and also "[t]he forfeiture of Biren's salary, bonuses and fringe benefits paid by Ark to Biren" during his employment with the company.

¶ 22                              III. Discovery Disputes

¶ 23    Though Biren's family members and their competitor companies were no longer parties to the case, Ark continued to pursue information from them, kicking off an intense discovery

battle. Over the course of more than two years, the parties fought relentlessly over what, if any, information Biren's family and their companies had to turn over to Ark. Given the issues in this case, it will be necessary to dive rather deeply into the discovery waters.

¶ 24     The fight began with discovery directed to Biren as a party-defendant and a subpoena to Biren's and his wife's competitor company, PBV.

¶ 25     Ark issued a subpoena to PBV for documentation to support its claims that Biren had diverted business originally destined for Ark to PBV. Referencing the "Group Exhibits" A and B detailed above, Ark sought the following information, among other items:

- "All emails, letters or other documents containing communications between PBV and Ark *** including any communications with Biren Parekh at his Ark e-mail address;"

- "The documents, including invoices and billing, regarding the particular transaction contained in the materials attached as Group Exhibit A;"

- The same request regarding the materials contained in Group Exhibit B;

- "Documents regarding PBV's customers that were or are the same as Ark;"

- "Forms used by PBV that are modeled after forms used by Ark;"

- "Any documents in which PBV criticizes or has negative comments about Ark;"

- "Documents regarding prospective customers that initially contacted Ark but became customers of PBV;"

- "Documents regarding customers of Ark that became customers of PBV;"

- Business/financial documents including but not limited to pricing, client quotations, margins and marketing strategy, of Ark that were forwarded or came into the possession of PBV;"

- "Business/financial documents including but not limited to pricing, client quotations, margins and marketing strategy, of Ark that were used/implemented entirely or partially by PBV."

¶ 26    PBV responded to the subpoena in April 2018, answering "none" to virtually all the requests identified above. PBV added: "To the extent this request seeks business records between PBV and any Ark customer, no such documents exist."

¶ 27    Ark further requested "PBV's financials from incorporation in 2000 up to the present." PBV objected to the disclosure of financial information as privileged and confidential. PBV further responded that the information was not likely to lead to the discovery of relevant information because "PBV has not done business with any actual or potential clients of Ark while Biren Parekh was employed by Ark nor has PBV paid any compensation, including bonuses, to Biren Parekh."

¶ 28    Ark was not convinced by these denials for at least two reasons. One, despite the fact that PBV would later identify Purnima as the "most knowledgeable person about the business and financial operations of PBV" for deposition purposes, Purnima testified that she never *saw* this subpoena. Rather, the individual who signed PBV's affidavit of completeness, attesting to the truth and completeness of these responses on PBV's behalf, was none other than Biren himself, the individual who swore in his deposition (as did Purnima in hers) that he played no role whatsoever at PBV until his resignation from Ark on November 30, 2016. (And even after he left Ark, both he and his wife testified that he only worked "on and off," "part-time" and unpaid, no more than 10 to 12 hours a week, for PBV.)

¶ 29    And for another, in his deposition, Biren stated that he *did not review PBV's records before responding to that subpoena*. Specifically, request number 7 in the PBV subpoena sought

"[d]ocuments regarding PBV's customers that were or are the same as Ark," to which PBV responded, "None." Likewise, in his answer to interrogatory no. 27 propounded to him as a party-defendant, which asked, "Have any of PBV's clients ever been clients of Ark?", Biren responded, beyond his objections, "No." At his deposition, Biren explained those answers:

"Q: And No. 7, okay, that rider request states, 'Documents regarding PBV's customers that were or are the same as Ark.' The response to that, if you look at the document response to record subpoena is, none. See where it says No. 7?

A. No. 7, yes, none.

Q. So, when you responded to this record subpoena, you said that you had no documents that showed that any of PBV's customers were the same or are the same as Ark's, correct?

A. Correct.

Q. And going back to *** interrogatory No. 27, the interrogatory, No. 27, asks, 'Have any of PBV's clients ever been clients of Ark?' And your answer is, 'In addition to the general objections, etc., subject to and without waiving said objection Biren states, no.' Do you see that?

A. Right.

Q. 'Have any of PBV's clients ever been clients of Ark?' And your answer is, 'no.' Correct?

A. Yes.

Q. And, what did you do to verify that none of PBV's clients were or had been clients of Ark?

[Question is re-read to witness.]

- 12 -

A. How did I know Ark's clients, I would not be able to address it, no?

[Defense Counsel]: You have to speak up and repeat your answer.

A. Unless I know who are the Ark customers, I cannot guess that, so, I say I do not know, so, I need to know the list of Ark clients to say that they were clients of PBV or not.

Q. But you know who Ark's customers are, you worked there for over 17 years?

A. But how do I, how do I know who PBV's clients, I don't know PBV's clients.

Q. Well, then you can't answer that, the only way you can answer that production request or that interrogatory is if you reviewed PBV's records. Did you review PBV's records when you –

A. I don't think so.

Q. So, you can't say for sure that that's not true, there may be customers that PBV has that are the same as ours?

A. No, unless I know, I can't say, yes.

Q. But you don't know because you didn't check PBV's records, correct?

A. So –

Q. Did you check PBV's records?

A. No. And I don't know what client Ark, they are talking about."

¶ 30    Beyond these answers of "none" that Biren all but disavowed in his deposition, PBV also objected and refused to turn over certain information. Prominent among those items were PBV's tax returns and PBV's "financials" since its inception.

¶ 31    So Ark filed a motion for a rule to show cause against PBV. As Ark put it, "If Biren is going to betray his employer—if Biren is going to lie to his employer—if Biren is going to steal

from his employer—what is to prevent Biren from continuing to lie about his thievery during this litigation?" Among other things, Ark continued to seek PBV's tax returns since 2000 (when PBV was founded, with Biren as president) and the "financials" of PBV to establish that PBV obtained clients that previously were serviced by Ark. Ark also subpoenaed Biren's family members for depositions. PBV, in turn, moved to quash the subpoenas and resisted the motion for rule to show cause.

¶ 32    Ark made two arguments in support of its petition for a rule to show cause. One, the information was necessary to prove damages on its breach-of-fiduciary claim. And two, the information would inform Ark as to whether PBV and its principals should be brought back into the case as defendants.

¶ 33    The court ruled against Ark and granted the motion to quash. In its oral ruling, the court stated that "the essence *** of the discovery sought by the plaintiff here is to determine from Plaintiff's own perspective whether or not the plaintiff has or may have a claim as to PBV in this matter." The court "respectfully disagree[d] that that is the object of discovery." The court reiterated that "doing discovery in a case to determine whether or not you can bring a cause of action, I fully disagree it is something that you can do."

¶ 34    Counsel for Ark reminded the court that it had a second, more fundamental ground for seeking the discovery—that PBV had in its possession the proof, if any, of whether PBV "stole" any Ark clients while Biren was working for Ark. Counsel noted that the alleged breach of fiduciary duty

> "resulted in financial losses. And these subpoenas directed to PBV and the other third-party respondents deal with financial loss information that they would have that would also, as a secondary matter could implicate them directly, but also would substantiate

Ark's claims of financial losses caused by Biren's formation of PBV and also the other corporation, MP Custom Brokers.

So it serves a dual purpose. It provides financial information that would substantiate the losses Ark suffered. But it would also—could also implicate them directly to be brought in as defendants, so it serves a dual purpose."

¶ 35    The court responded: "I gathered that was one of the arguments that you made. We may have a difference of opinion. I've made my ruling."

¶ 36    Notably, however, at no time did Ark point out to the circuit court what it pointed out to this court on appeal: the obvious discrepancy between (1) PBV claiming, in writing, not to have any documents relating to clients that were former Ark clients, and (2) the testimony of Biren, who provided that response for PBV, that he never even bothered to check PBV's records before providing those responses.

¶ 37    In any event, with the court having ruled that the information sought in Ark's subpoena to PBV was improper, Ark named PBV, MP, and members of Biren's family as respondents in discovery. See 735 ILCS 5/2-402 (West 2016) ("The plaintiff in any civil action may designate as respondents in discovery *** those individuals or other entities *** believed by the plaintiff to have information essential to the determination of who should properly be named as additional defendants in the action.").

¶ 38    The respondents in discovery, represented by the same counsel as Biren, moved for sanctions against Ark. At the hearing, the court not only denied the motion for sanctions but reversed course in part. Revisiting the subpoena directed to PBV, determined that Ark was entitled to PBV's tax returns since incorporation. The court again noted, however, that Ark's request for "financials" in the PBV subpoena was too vague.

¶ 39    Now armed with the tax returns, Ark promulgated requests for documents to the respondents in discovery. Heeding the court's concern about the vagueness of the term "financials," Ark's discovery requests to the respondents in discovery put flesh on the bone, defining "financials" by the categories listed on PBV's tax returns. Ark also requested, among other things, "the invoices sent by PBV to its customers from 2000 up to the present" and "the payments received by PBV from its customers from 2000 up to the present." Quite clearly, Ark was attempting to learn the identity of PBV's customers since its incorporation in 2000 to determine if any Ark customers (existing or prospective) were diverted to PBV.

¶ 40    Ark likewise subpoenaed PBV's accountant, similarly seeking backup documentation that would include client-specific documents like invoices. One of the reasons Ark sought this information from the accountant was that Biren's daughter, Poonam, testified that both PBV and MP destroyed company records after five years, leaving open the possibility that many possibly relevant records were permanently deleted. Ark's hope was that the accountant might have some or all of those older documents.

¶ 41    A litany of objections and motions to compel ensued; suffice it to say, for our purposes, that Biren and the respondents in discovery (all represented by the same counsel) objected at every turn to virtually every discovery request. Ark sought relief from the circuit court via a motion to compel. The court denied that motion. The court first noted its exhaustion from all the discovery fights in this case: "This contentious case has generated countless motions and has caused the Court to expend considerable judicial resources in resolving said motions."

¶ 42    The court denied the motion to compel because Ark had not laid out with sufficient precision its basis for relevance for each particular discovery request. As the court put it:

"Ark Shipping's motion does not expressly indicate which requests it seeks the Court to rule upon, and instead provides examples of requests that it believes are relevant to the various causes of action. *** Despite being advised by the Court multiple times of its failure to articulate the exact requests that are at issue, Ark Shipping again failed to delineate the specific requests in its prayer for relief. It is not this Court's job to comb through the motion and attached exhibits to determine which discovery request is at issue; rather, that is a stake for the movant ***."

¶ 43    The court quashed the subpoena to PBV's accountant, as well.

¶ 44    At the end of the day, Ark never obtained a list of PBV's clients, in whatever form, to determine whether any of PBV's clients had been former or prospective clients of Ark.

¶ 45                                   IV. Motion for Summary Judgment

¶ 46    Biren moved for summary judgment, arguing that the absence of any proof of business loss to Ark doomed its claim for breach of fiduciary duty. Biren pointed to the absence of proof and the testimony of Ark's witnesses, including principals from the Indian parent company, CKB, that they could not identify any business loss until they could review PBV's books.

¶ 47    Ark cross-moved for summary judgment, arguing that, even if it could not substantiate actual business loss, it was entitled to the remedy of disgorgement—the forfeiture of Biren's salary and benefits during the time he breached his fiduciary duty, which in Ark's view dated back to August 2000, when PBV was incorporated with Biren as president.

¶ 48    Ark also filed a motion under Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013), arguing that it could not respond to the argument that there was no proof of damages unless it was able to obtain PBV's business and financial documentation.

¶ 49 It did not help matters that the cross-motions were filed at the onset of the COVID-19 pandemic or that, around that same time, the judge who had presided over this lengthy discovery fight left the bench to join the federal judiciary, prompting the reassignment of this case to a new judge.

¶ 50 In February 2021, the new judge denied Ark's Rule 191(b) motion. The court primarily focused on the fact that Ark had plenty of time to find the information it needed. As the court put it, "Counsel, discovery doesn't go on forever. And this is your case. And when you filed it, you would have had some idea of what you needed to prove in order to prove your case and what you needed in discovery."

¶ 51 After the court denied the Rule 191(b) motion, it required Ark to file a formal response to Biren's motion for summary judgment. In that response, Ark primarily contended that it did not need to show loss of customers because "all of PBV's profits are subject to the imposition of a constructive trust and accounting." Ark pleaded that "Biren should not be allowed to benefit from the difficulty in verifying such losses due to the passage of time and the court denying Ark's access to PBV's business records."

¶ 52 Ultimately, the court entered summary judgment against Ark and in Biren's favor. The court acknowledged that "[Biren] admits to forwarding a number of emails from his Ark account to Purnima and Poonam but states that there is no evidence he ever solicited or diverted any of Ark's business to PBV and MP." The court found no evidence that Biren "solicited Ark's customers and employes for the benefit of PBV or MP, or that he began competing with Ark through PBV or MP while still employed. Ark admitted in its depositions that it is not aware of any clients that conducted business with PBV or MP, nor is it aware of any clients that Parekh, PBV, or MP solicited via any of the e-mails [Biren] sent." The court's initial order made no

mention of the consolidated tortious-interference claim. So in December, the court entered an order clarifying its October 12 memorandum order to include summary judgment on Ark's tortious-interference claim. Ark timely moved for reconsideration, which the court denied.

¶ 53                         IV. Motion for Sanctions

¶ 54    Biren then moved for sanctions under Supreme Court Rule 137 (eff. Jan. 1, 2018), arguing that Ark "abused the judicial process to harass and financially devastate" Biren and his family. The motion claimed that Ark pursued "causes of action that [it] knew were unsupported by any factual basis." Biren sought "all of the attorneys fees and costs incurred by Biren and his family defending the frivolous lawsuits which to date, are in excess of $300,000." The court granted the motion for sanctions and awarded $304,645.86 in fees to Biren.

¶ 55    Ark timely appealed. We held the appeal in abeyance pending the outcome of the sanctions hearing. See Ill. S. Ct. R. 303(a)(2) (eff. July 1, 2017). Ark then amended its notice of appeal to include an appeal of the court's sanctions order.

¶ 56                            ANALYSIS

¶ 57    Ark argues that the trial court abused its discretion in its numerous rulings denying certain discovery to Ark and in denying Ark's Rule 191(b) motion for discovery before summary judgment. Ark claims the court erred in entering summary judgment and in awarding sanctions to Biren. Finally, Ark asks us to reverse the court's dismissal of the fraud claim from the first amended complaint, despite acknowledging that "this portion of Ark's brief is untimely."

¶ 58                         I. Discovery Orders

¶ 59    Ark first claims the circuit court unfairly denied it discovery related to PBV and MP's business records. "The circuit court's discretionary powers regarding pretrial discovery are extremely broad." *Hayward v. C.H. Robinson Co.*, 2014 IL App (3d) 130530, ¶ 45. We review

these rulings for an abuse of discretion. *Crichton v. Golden Rule Insurance Co.*, 358 Ill. App. 3d 1137, 1150 (2005). We will reverse the court's decision only if no reasonable person would take the view adopted by the trial court. *Thomas v. Weatherguard Construction Company, Inc.*, 2018 IL App (1st) 171238, ¶ 53.

¶ 60    Generally, a claim for breach of fiduciary duty requires the existence of a fiduciary duty, a breach of that duty, and damages proximately caused by the breach. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69. Probably the most common form of damages, when a fiduciary diverts business to a competitor, is the business lost by the plaintiff company to the competitor. See *Indeck Energy Services, Inc. v. DePodesta*, 2021 IL 125733, ¶ 47. If the plaintiff cannot show that the fiduciary usurped the opportunity for his or her own benefit, the claim will fail. See *id.* ¶ 48 ("unsuccessful attempt to [usurp opportunity] does not give rise to a claim of misappropriation of corporate opportunity.")

¶ 61    So naturally, Ark's first order of business was to determine whether PBV had any clients that used to be Ark's clients or were prospective Ark clients. At the outset, Ark issued a subpoena to PBV that would seem to accomplish that very thing. Ark requested all documentation regarding any PBV clients that were formerly Ark clients. Indeed, Ark made that request about five different ways, presumably to cover its bases.

¶ 62    Yet PBV answered "None" to each of these requests; PBV said it had no documents regarding PBV clients that once were serviced by Ark. PBV doubled down by restating that position twice in its response to the subpoena: "To the extent this request seeks business records between PBV and any Ark customer, no such documents exist;" "PBV has not done business with any actual or potential clients of Ark while Biren Parekh was employed by Ark."

¶ 63    But later Biren testified at his deposition that he never even checked to see if any PBV clients were previous Ark clients; he reviewed no records before answering "None" repeatedly. His attempt to justify it strained all credulity—he did not know what clients Ark had, he said, despite having run Ark since its inception; he did not know what clients PBV had, he said, despite the fact that he was answering the subpoena *on PBV's behalf*. Nor did he ever explain why, if all this was such a mystery, he didn't simply decline to answer, or object to vagueness, or do anything other than giving the conclusive answer, "None," to these critical requests.

¶ 64    Had Ark simply moved forward with this isolated but clear abuse of the discovery process, we can only imagine that the original judge hearing this case would have granted Ark relief, if not sanctioned Biren as well for his deceptive answers. There was nothing more important to Ark in this case than some list, some documentation showing an overlap between clients serviced by Ark and later by PBV, so that Ark could prove its lost-business damages. These requests were the very ones that would provide that information.

¶ 65    Instead, Ark moved to compel in a document that, like others that would follow, unfortunately lumped together a great deal of discovery in one argument without detailing out, request by request or question by question, why it was entitled to the discovery. We quoted above one instance when the court chastised Ark for that very thing, but in fact, the court made this observation consistently during the course of this discovery fight. The court repeatedly referred to Ark "dumping" information on the court and expecting the court to sort it out.

¶ 66    We will not belabor this point. Ark should have been granted access to some form of a listing of PBV's clients against which it could measure its own former or prospective clients, be it a literal list, invoices or other documents; there are probably several different forms this information could take. And surely the disclosure would include some version of a protective

order or other method of shielding proprietary information—an attorneys-eyes-only designation, a special master, an *in camera* inspection.

¶ 67     We should add here that we are not saying that PBV, in fact, "stole" existing or prospective clients from Ark with Biren's assistance. There is no way to know that. Our only point is that Biren and PBV abused the discovery process and thereby prevented the truth from ever coming to light, one way or the other.

¶ 68     We will give Ark points for going to great lengths to obtain this information. Unfortunately, Ark never broke the matter down into simple terms, particularly at the outset with the PBV subpoena. Though we are left with a sense of injustice, the discovery rules provide remedies for abuse of the discovery process. On the record before us, we simply cannot identify any specific ruling by the circuit court that rises to the level of an abuse of discretion. So we have no basis to disturb the court's discovery decisions.

¶ 69                                    II. Denial of Rule 191(b) Motion

¶ 70     For much the same reason, we find no error in the denial of Ark's Rule 191(b) motion for additional discovery, which we also review for an abuse of discretion. *National Tractor Parts Inc. v Caterpillar Logistics, Inc.*, 2020 IL App (2d) 181056, ¶ 69. However unfair the outcome of this discovery may have been, the new judge hearing the motion could reasonably feel that Ark had ample time to utilize the tools of discovery to remedy any problem. Discovery is not endless. We cannot say that no reasonable person would have denied this Rule 191(b) motion.

¶ 71                                    III. Summary Judgment

¶ 72     As noted, the court entered summary judgment on the claim of breach of fiduciary duty. Ark, in fact, pleaded two distinct theories of breach of fiduciary duty, as we explain below. Our review of a grant of summary judgment is *de novo*. *Id*. ¶ 38.

¶ 73                              A. Usurpation of Corporate Opportunity

¶ 74      To the extent Ark premises its claim for breach of fiduciary duty on the loss of business

to PBV, its theory falls under the corporate-opportunity doctrine. See *DePodesta*, 2021 IL

125733, ¶ 47 ("Usurpation of a corporate opportunity is a distinct cause of action for breach of

fiduciary duty that involves *** the taking or seizing of a corporate opportunity and the

commensurate loss of that opportunity by the corporation."); *Mullaney, Wells & Co. v. Savage*,

78 Ill. 2d 534, 545-46 (1980) ("it is a breach of fiduciary obligation for a person to seize for his

own advantage a business opportunity which rightfully belongs to the corporation").

¶ 75      Our supreme court has been clear, however, that an "unsuccessful attempt" to usurp a

corporate opportunity that, for whatever reason, "did not come to fruition" will not state a claim

for breach of fiduciary duty under the corporate-opportunity doctrine. *DePodesta*, 2021 IL

125733, ¶ 47. Said differently, under this particular theory of breach of fiduciary duty, Ark must

not only show that Biren and PBV *tried* to steal its business; it must show that they succeeded in

doing so. And it should be clear by now that, fair or unfair, Ark has no proof that Biren and PBV

actually stole customers, existing or prospective, from Ark. Summary judgment in favor of Biren

was thus proper under this theory of breach of fiduciary duty.

¶ 76                                      B. Disgorgement

¶ 77      Since the inception of this litigation, Ark has alternatively pleaded its entitlement to the

remedy of disgorgement, seeking "[t]he forfeiture of Biren's salary, bonuses and fringe benefits

paid by Ark to Biren from August 14, 2000, to November 30, 2016," which represents the entire

time that Biren acted as president of PBV, all the while serving as the highest-ranking employee

(and for most of that time, vice-president) of Ark. Though the circuit court made no mention of

that theory in its ruling, Ark cross-moved for summary judgment on this basis and raises it again on appeal.

¶ 78    "Illinois law permits a complete forfeiture of any salary paid by a corporation to its fiduciary during a time when the fiduciary was breaching his duty to the corporation." *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 373 (1994). As far back as 1974, our supreme court recognized disgorgement as a separate claim for damages that does not constitute an improper double recovery alongside lost profits. See *Vendo Co. v. Stoner*, 58 Ill. 2d 289, 314 (1974).

¶ 79    The doctrine of disgorgement is unconcerned with the actual damage caused by the breach of fiduciary duty. Rather, it is based on the public policy principle, which has " 'long been recognized[,]' that a fiduciary employee is entitled to compensation only 'on a due and faithful performance' of all his duties." *Levy*, 268 Ill. App. 3d at 373-74 (quoting *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App. 3d 817, 837 (1980)). As our supreme court noted, "[i]t borders on the frivolous for defendants to claim a right to retain the compensation" the fiduciary received during the time he breached his duty to the plaintiff corporation. *Vendo*, 58 Ill. 2d at 314.

¶ 80    So the doctrine " 'does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.' " *Levy*, 268 Ill. App. 3d at 373 (quoting *Graham v. Mimms*, 111 Ill. App. 3d 751, 762–63 (1982)).

¶ 81    Thus, " 'it makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the misconduct of the agent affects the contract from considerations of *public policy* rather than of injury to the principal.' " (Emphasis in original.) *Levy*, 268 Ill. App.

3d at 373-74 (quoting *ABC,* 90 Ill. App. 3d at 837). See also *Hill v. Names & Addresses, Inc.*, 212 Ill. App. 3d 1065, 1083 (1991) (noting public policy of " 'removing all temptation' " from fiduciary to breach duty to corporation) (quoting *Graham*, 111 Ill. App. 3d at 762-63).

¶ 82     Biren does not address the remedy of disgorgement/forfeiture in his appellate brief. He does claim, to be sure, that he never breached his fiduciary duty to Ark. But he bases this argument on the absence of proof of business loss. It is one thing to say that a plaintiff cannot *recover damages* for breach of fiduciary because he cannot prove actual business loss. (Under the corporate-opportunity theory of breach of fiduciary duty, that is true, as discussed above.) But it is quite another to say that Biren did not breach his fiduciary duty, full stop. Biren has not come close to convincing us that no breach of duty occurred here—or at least that no question of material fact exists on that question.

¶ 83     Both employees and officers of a corporation owe duties to their corporations, though not the same ones. *Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 160 (1993). Employees, absent some contractual prohibition, can compete with a company and solicit customers *after* they terminate their employment. *Cooper Linse Hallman Capital Management, Inc. v. Hallman*, 368 Ill. App. 3d 353, 357 (2006); *Veco*, 243 Ill. App. 3d at 160. While employed, employees may go so far as to "plan, form and outfit a competing corporation so long as they do not commence competition." *Cooper*, 368 Ill. App. 3d at 357; see *Veco*, 243 Ill. App. 3d at 160.

¶ 84     But corporate officers "stand on a different footing." *Veco*, 243 Ill. App. 3d at 160; see *Smith-Shrader Co., Inc. v. Smith*, 136 Ill. App. 3d 571, 577 (1985); *H. Vincent Allen & Associates, Inc. v. Weis*, 63 Ill. App. 3d 285, 291 (1978). Officers have been found to have breached their fiduciary duties, among other ways, when they:

" ' (1) fail to inform the company that employees are forming a rival company or

engaging in other fiduciary breaches [citation]; (2) solicit the business of a single

customer before leaving the company [citation]; (3) use the company's facilities or

equipment to assist them in developing their new business [citation]; or (4) solicit fellow

employees to join a rival business [citation].' " *Cooper*, 368 Ill. App. 3d at 357 (quoting

*Foodcomm International v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003)).

¶ 85    Here, there is at least a question of fact as to whether Biren committed several of these

breaches. It appears clear, for example, that Biren never informed Ark that he had incorporated a

direct competitor business, with himself as president, while he was the highest-ranking official at

Ark. See *Unichem Corp. v. Gurtler*, 148 Ill. App. 3d 284, 290-91 (1986) ("[A]t the very

minimum, a corporate officer must deal honestly with his corporation and must thereby disclose

those facts which he is aware of that threaten the corporation's existence."); *Foodcomm*, 328

F.3d at 304 (noting that fiduciaries' failure "to inform [plaintiff company] of each other's plans

to join Empire and form Outback, a rival company to [plaintiff]" would constitute breach of

fiduciary duty).

¶ 86    And even if Biren were not yet at the level of an "officer" at the time of PBV's

incorporation—he was not named vice-president until 2005, five years after PBV's

incorporation—even an employee may not "commence competition" with his employer while

still an employee. *Cooper*, 368 Ill. App. 3d at 357; see *Veco*, 243 Ill. App. 3d at 160.

¶ 87    It would also appear, from the documents that Ark appended to its pleadings and which

we discussed in detail above, that at least during a window of time in 2016, Biren was

forwarding a number of emails regarding business solicitations and Ark's proprietary

information to his family members at PBV. Even if none of those diversions resulted in a

solicitation of business—a question to which we will likely never have an answer, as discussed above—this would appear to be an example of "us[ing] the company's facilities or equipment to assist [the competitor] in developing their new business." *Cooper Linse*, 368 Ill. App. 3d at 357 (quoting *Foodcomm*, 328 F.3d at 303).

¶ 88    Indeed, in *ABC*, 62 Ill. App. 3d 671, the plaintiff, a freight forwarding company, sued the former president and vice president of its subsidiary, who formed a competing freight-forwarding company. Among other things, the defendant fiduciaries and their associates used the "plaintiff's facilities, funds and personal property *** to pre-stamp [the rival corporation's] air bills, to furnish office supplies and airline containers to [the rival corporation], and to prepare [the rival corporation]'s daily station report forms." *Id*. at 685. We found this activity, among other actions taken by the fiduciaries, to be a breach of fiduciary duty. *Id*.

¶ 89    Biren makes much of the fact that, though he was the president of PBV via the articles of incorporation, he never lifted a finger in assistance of that company since its incorporation in August 2000. Both he and his wife Punima testified that he was named president only due to Indian custom as the "head of the household." For sixteen years, he testified, he never provided the slightest bit of help.

¶ 90    To that we have two responses. The first is that a president who "doesn't do anything" is still the president. The articles of incorporation, the very constitution of the company, filed with the state named him as such, and he thus owed a fiduciary duty to PBV as president. We are aware of no legal authority, nor has Biren cited any, where a fiduciary's duty to his corporation rises or falls on how much or how hard he works.

¶ 91    Imagine, for example, a family company with the father as its president, who retains the title even though, in his advanced age, he has yielded all responsibilities to his children, the other

officers. If the father snuck off and started a competing company while retaining the title of president of his family company, would the law give him a pass because he didn't really do much work for the family company anymore? The notion is ludicrous.

¶ 92    So too here. Even if we accept that Biren was named president despite having zero responsibilities, performing absolutely zero work, and giving zero advice whatsoever, he was nevertheless PBV's president. During almost the entire time he ran the day-to-operations of Ark as its highest-ranking employee/officer, Biren owed a fiduciary duty to a direct competitor of Ark operating out of his own home.

¶ 93    Our second response is that a question of fact remains as to how much work Biren did or did not do for PBV. True, he and his wife testified that he played no role at all. But that does not make it so. A reasonable factfinder could choose not to believe that testimony.

¶ 94    Punima, for example, insisted in her deposition that Biren did not help her even with the start-up of PBV. Despite the fact that her education was in child psychology, and her work experience to that point (a teacher at a daycare for young children; a cashier at Target) bore no relationship to freight forwarding, she claims to have learned the necessary tools of the freight-forwarding trade not from her husband, who had several decades of experience in the field, but from reading books: "I went to library and do some research and did some—looked up the books and was interested in that and I got the knowledge." Nor did anyone else help her at the outset; her son Vishal did not start working with her, she testified, until five years later in 2005.

¶ 95    Perhaps it is just a coincidence that Punima decided to start a company in precisely the same line of work as her husband, only a few short months after he started working for Ark. Perhaps she took no advice or assistance from her husband, the president, with his decades of experience in that exact field, and instead learned all there was to know about starting up and

operating a freight-forwarding company *singlehandedly* from books she read at the library. And perhaps those emails Biren was caught forwarding to PBV containing business opportunities and proprietary pricing were isolated episodes in 2016, the only time in the history of Biren's tenure at Ark that he forwarded emails of that nature to PBV.

¶ 96    But Ark, as the non-movant at the summary judgment stage, is entitled to reasonable inferences drawn in its favor. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257 (2004). And a factfinder could reasonably conclude that Biren's and Punima's testimony is simply not believable.

¶ 97    So we are left with this much: Ark has competent evidence that (1) Biren owed a duty of loyalty to a direct competitor nearly the entire time he worked at Ark, most of that time as Ark's vice-president; (2) Biren, by all accounts, never informed Ark, over those 16 years, that he was president of a competitor or that his wife was operating a direct competitor out of his own home; (3) Biren, at least in 2016, was using Ark resources to divert emails of a sensitive nature to PBV.

¶ 98    That may or may not be an exhaustive list, but it is more than sufficient evidence of a breach of fiduciary duty to survive summary judgment. As for the disgorgement remedy, it will be for the trial court to decide whether to impose it and for what length of time any compensation from Biren should be forfeited. See *Indeck*, 2021 IL 125733, ¶ 58 (disgorgement of compensation is equitable remedy subject to court's discretion).

¶ 99    We thus reverse the grant of summary judgment to the extent that Ark seeks the remedy of disgorgement based on Biren's breach of fiduciary duty.

¶ 100                              IV. Remaining Counts

¶ 101   In its briefs, Ark does not reference the entry of summary judgment on its tortious-interference claim, much less make any argument claiming error. It has thus forfeited any error,

and we affirm summary judgment as to that count. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***."); *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 48 n.2.

¶ 102   Ark acknowledges that its appeal of the dismissal of its fraud count is untimely. The problem is not of timeliness but forfeiture.

¶ 103   A party that amends its complaint forfeits any objection to the trial court's ruling on previous versions of the complaint unless it takes steps to preserve any claimed errors. *Foxcroft Townhome Owners Association v. Hoffman Rosner Corp.*, 96 Ill. 2d 150, 153 (1983); *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 718 (2010). To preserve an error, a party may stand on the complaint in which the counts were dismissed; amend the complaint and incorporate in some manner the dismissed counts for the purposes of preservation and appeal; or file an interlocutory appeal as allowed by the supreme court rules, such as Rule 304(a). *Vilardo*, 406 Ill. App. 3d at 719; see Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016).

¶ 104   The court dismissed Ark's fraud count in the amended complaint. Ark then filed the second amended complaint, which only included claims for breach of fiduciary duty and accounting. Nowhere does the second amended complaint "realleg[e], incorporat[e] by reference, or refer[]" to the dismissed fraud claim to preserve it. *Childs v. Pinnacle Health Care, LLC*, 399 Ill. App. 3d 167, 176 (2010). As this error is forfeited, we will not consider it further.

¶ 105                                    V. Award of Sanctions

¶ 106   We reverse the award of sanctions. That award is arguably moot in light of our resolution. If any more need be said, it is more than clear to us that Ark had a good-faith basis for bringing this lawsuit against Biren. We will never know what Ark might have been able to prove in terms of lost-business damages had the discovery process not gone so far off the rails. But the

disgorgement remedy remains viable. And in any event, given the rather damning evidence that Ark uncovered as to Biren's surreptitious forwarding of emails to PBV, a direct competitor, any reasonable litigant would have sued. The notion that this lawsuit was frivolous or brought in bad-faith is utterly meritless. We reverse the court's ruling to the contrary.

¶ 107                                    CONCLUSION

¶ 108    The judgment of the circuit court is affirmed in part and reversed in part. Summary judgment in favor of Biren on the count for breach of fiduciary duty is affirmed insofar as Ark claims damages for lost business. Summary judgment in favor of Biren on the count for breach of fiduciary duty is reversed insofar as Ark seeks the remedy of disgorgement. Summary judgment on all other counts is affirmed. The award of sanctions is reversed. The cause is remanded for further proceedings.

¶ 109    Affirmed in part, reversed, in part; remanded.